# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 20, 2015
NOT TO BE PUBLISHED

*Supreme Court of Kentucky* FINAL

2015-SC-000026-WC

DATE 9-10-15 _EwAGroupp?_

MODERN PROPERTY MANAGEMENT                                    APPELLANT


                    ON APPEAL FROM COURT OF APPEALS
V.                       CASE NO. 2013-CA-001425-WC
                 WORKERS' COMPENSATION NO. 10-00459



ESTATE OF JEFFREY ALLEN WILBURN
(DECEASED); JULIE A. VAN HOOK,
ADMINISTRATRIX AND PARENT AND
GUARDIAN OF AMANDA WILBURN
AND MAXWELL WILBURN; HEIDI MARIE
CANTER, PARENT AND NATURAL
GUARDIAN OF ICY CANTER;
HONORABLE OTTO DANIEL WOLFF, IV,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD                                    APPELLEES




                 **MEMORANDUM OPINION OF THE COURT**

                              **AFFIRMING**

        Appellant, Modern Property Management, ("Modern") appeals a Court of

Appeals decision which upheld an Administrative Law Judge's ("ALJ") finding

that Jeffrey Allen Wilburn was within the scope of his employment when he

was shot and killed. Modern argues on appeal that: 1) the finding Wilburn

returned to his work duties when he began to interact with his murderer,

Latarra Martin, is not supported by substantial evidence; and 2) it was an error

to award interest on the benefits per KRS 342.750(6). For the reasons set forth below, we affirm the Court of Appeals.

Wilburn was employed as a maintenance manager for Modern. He leased an apartment from Modern and paid a reduced rent because he was fixing it up for future tenants. Tenants in the building would occasionally approach Wilburn when repairs needed to be made although he was not assigned to work at any specific building. Wilburn performed repairs all over Lexington on behalf of Modern.

On March 11, 2009, Wilburn left work at another building and went to his apartment to eat lunch with some friends, Harvey Wisman, Mary Ann Sacco, and George "Cornbread" Corman. During lunch, there was a loud knock on the door. Wilburn saw it was Martin and opened the door. Martin was a tenant in Wilburn's building.

A few words were exchanged between Wilburn and Martin. Wilburn purportedly entered Martin's apartment. None of Wilburn's guests heard the subject of the conversation. However, Corman testified that he heard Wilburn say something like "okay" or "I'll handle it." Shortly thereafter, Martin pulled out a gun and shot Wilburn. Martin attempted to shoot Corman, but her gun did not fire. Wilburn soon died from his injuries.

Lexington Police Detective John Scott Gibbons was the first officer to arrive at the scene. He testified at Martin's criminal trial that when he arrived she was sobbing saying "I want my money." Detective Gibbons asked Martin what had happened, and she told him that she was tired of "them messing with

2

her, that they were trying to make her think she was crazy, and that she could hear them talking inside her apartment." Martin also stated she had "dirty water" and that she believed Wilburn was her father and working for the police.

Sergeant Michael Sharpe also testified at Martin's trial. He verified that Martin told Detective Gibbons that she had dirty water. Sergeant Sharpe said he inferred that Martin "had some kind of plumbing issue with the apartment people. And there was just nasty water, rusty water, running water, it was in her apartment. It bugged her, and she'd had all she could take of it." Upon checking the water in the apartment, Sergeant Sharpe did not observe any problems.

Martin was evaluated by Dr. Greg Perri, PhD, for trial. He found that Martin suffers from personality disorder, with schizoid and paranoid features. Dr. Perri noted that Martin imagined she had dirty water at her apartment. Dr. Perri determined that Martin believed the police were coming to have her committed the day of the murder. Martin also believed that rapper "Lil' Wayne" stole the lyrics to several songs she had written.

Following a jury trial, Martin was found guilty but mentally ill of murder. Her conviction was affirmed by this Court on direct appeal. *Martin v. Commonwealth*, 2010-SC-000830-MR (December 22, 2011). The Estate of Jeffrey Allen Wilburn, Julie A. Van Hook, administratrix and parent and guardian of Amanda Wilburn and Maxwell Wilburn, and Heidi Marie Canter, parent and natural guardian of Icy Canter, filed for workers' compensation.

3

They alleged that Wilburn was within the scope of his employment as a maintenance manager when he began to speak with Martin.

In making his decision, the ALJ reviewed the transcripts of the witnesses who testified in Martin's criminal trial. He made the following findings regarding whether Wilburn was within the scope of his employment when murdered:

> On the morning of [Wilburn]'s death he was clearly an employee of [Modern]. If [Wilburn] had stopped working to just eat lunch, per [*Corken v. Corken Steel Products*, 385 S.W.2d 949 (Ky. 1965)], he would remain an employee during that time, but according to Wisman's testimony, we know [Wilburn] took a break from his work for personal reasons – to lunch with his out-of-town guests, to visit with them and to take them to the airport. This was a personal errand which caused him, at least temporarily, to be removed from the employee/employer relationship.
>
> This could be the end of the analysis, but there may have been another change in his status when he interrupted his lunch and was required to do business with Martin. If what transpired with Martin was of a business nature, then [Wilburn] would have ceased being on his own errand and would return to employee/employer status. Consequently, the facts must be examined in an effort to characterize [Wilburn]'s status when he was dealing with Martin.
>
> It is unclear *exactly* what transpired between [Wilburn] and Martin, because [Wilburn] is dead and Martin, as determined by the Fayette Circuit Court, is insane. The best available evidence to make this determination comes from several of the witnesses. Witness [Van Hook], [Wilburn]'s ex-wife answered, "Definitely no" to the question of whether [Wilburn] would have had any other type of relationship with Martin, other than that of a business nature, and she knew [Wilburn] had been to Martin's apartment to deal with a plumbing problem.
>
> Witness Corman, who was closer to the action than anyone, observed [Wilburn] leave his apartment and go a slight way into Martin's apartment. When [Wilburn] came out of Martin's apartment Corman thought he heard [Wilburn] say something like, "okay, or I'll handle it."
>
> Detective Gibbons, immediately following the shooting asked Martin why she shot [Wilburn] and she stated, "She had dirty

4

water." Subsequent investigations found [Martin] did not have dirty water in her plumbing.

When asked about Martin's dirty water Sgt. Sharp stated, "We were led to believe that she had some kind of plumbing issue with the apartment. There was just nasty water, rusty water, running water, it was in her apartment. It bugged her, and she did all she could to take [sic] of it."

Forensic psychologist Gregory Perri testified, he spoke with Martin approximately a month after the murder. This was also after she had been given medication to bring in check, as best could be done, her mental illness. When asked why she shot [Wilburn], she listed several reasons, one of which was, her answering "Yes" to the question, did she believe there was dirty water coming out of her faucet. She asked him [Wilburn] to come and observe the leak.

On the day of his death, there was no reason for [Wilburn] to be involved with Martin, but for his being a maintenance man for [Modern]. Martin engaged him to discuss preconceived dirty water problem because he was [Modern]'s maintenance man. [Wilburn] was placed in a place of danger due to his employment with [Modern].

The evidence comes in the form of circumstantial evidence; an employee is authorized to use circumstantial evidence to prove the elements of his workers' compensation claim. *Hunt's Adm'x v. Fuque*, 224 S.W.2d 917 (Ky. 1950). The circumstantial evidence includes the fact [Wilburn] had previously been to [Martin]'s apartment to work on a plumbing problem, Corman's testimony [Wilburn] entered Martin's apartment and left saying something to Martin like, "Okay, I'll handle it." The two police officers heard [Martin] give an explanation that she shot [Wilburn] because she believed she had dirty water, and Dr. Perri's report that Martin believed she had dirty water and asked [Wilburn] to come into her apartment to observe faucet leaks. In determining whether an injury is work-related under workers' compensation law, no single factor should be given conclusive weight instead the coverage decision must be based upon the quantum of aggregate facts, rather than the existence or nonexistence of any particular factor.

Based upon the above, this ALJ is persuaded [Wilburn], at the time of his death, was in an employee/employer relationship with [Modern].

Modern attempted to appeal to the Board. However, the Board dismissed the appeal, finding that it was taken from an interlocutory order. On remand, the ALJ readopted his finding that Wilburn was within the scope of his

5

employment with Modern when he was murdered. The ALJ also awarded Wilburn's estate death benefits pursuant to KRS 342.750. The ALJ further determined that Wilburn's estate was entitled to interest on the death benefits at the rate of 12% per KRS 342.750(6). Modern was ordered to pay income benefits to each of Wilburn's dependents pursuant to KRS 342.750(1)(d).

On appeal, the Board affirmed the ALJ's opinion, order, and award. The Court of Appeals also affirmed, and this appeal followed.

The function of the Court of Appeals is to "correct the Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992). The ALJ, as fact-finder, has sole authority to determine the weight, credibility, and inferences to be drawn from the evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). The ALJ is given broad discretion to weigh the quality and substance of the evidence. *Square D Co. v. Tipton*, 862 S.W.2d 308, 309 (Ky. 1993). Keeping these principles in mind, we affirm the Court of Appeals.

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S FINDING THAT WILBURN WAS MURDERED IN THE SCOPE OF HIS EMPLOYMENT WITH MODERN

Modern's first argument is that the record does not support the ALJ's conclusion that Wilburn was murdered while within the scope of his employment. Modern makes several arguments to contend that the ALJ's conclusion is contrary to the record. These arguments include that: 1) Corman

6

testified that Wilburn said "ok" or "I'll handle it" after speaking with Martin which prohibits a conclusion that they were discussing apartment maintenance; 2) it is irrelevant that other tenants had previously approached Wilburn about maintenance issues because there is no testimony regarding the content of the conversation between Wilburn and Martin; 3) the fact Wilburn previously visited Martin's apartment to perform maintenance is irrelevant in determining the actual reason for the murder; and 4) Martin did not actually say that she shot Wilburn because of dirty water in her apartment. Boiled down, Modern argues that the ALJ's findings are based on circumstantial evidence which could be interpreted to support its position that Wilburn was not within the scope of his employment when he was murdered. Modern specifically notes Martin's apparent belief that Wilburn was working for the police and he was trying to get her committed as a motive for the murder.

Admittedly, the evidence Modern points to can support the contention that Martin did not murder Wilburn because of an alleged maintenance issue involving dirty water in her apartment. However, the fact that there is evidence to support its position over the one the ALJ adopted is not grounds to reverse his findings. *McCloud v. Beth-Elkhorn Corp.*, 514 S.W.2d 46 (Ky. 1974). There is evidence to support the ALJ's finding that Wilburn was within the scope of his employment when murdered, and thus we may not disturb it on appeal. This evidence includes Martin's statement about dirty water, the fact that residents would personally approach Wilburn for maintenance assistance, that Wilburn did purportedly step into Martin's apartment, and Corman's testimony

7

that Wilburn might have said "I'll handle it" after speaking with Martin. Thus, we must reject Modern's argument.

Modern additionally argues that this situation is not analogous to *Corken*, 385 S.W.2d 949, which was cited as support in the ALJ's opinion. In *Corken*, a salesman employed by Corken Steel, was visiting customers in Campbell County, Kentucky. He stopped for lunch at a restaurant in Newport. As he was leaving the restaurant, Corken was shot and killed by a mentally disturbed individual for no apparent reason. Our predecessor Court found that Corken's employment was the reason for his presence at what turned out to be a place of danger, since he would not have been killed but for his visiting customers in that area. Thus, Corken's death arose out of his employment. *Id.* at 950. Like *Corken*, Wilburn's employment with Modern placed him in the position to have contact with Martin. Wilburn's agreement with Modern to receive reduced rent for his apartment in exchange for renovating it made him Martin's neighbor. As stated above, there was sufficient evidence to support the ALJ's conclusion that Martin approached Wilburn to discuss a maintenance issue.

## II. THE ALJ DID NOT ERR BY AWARDING INTEREST ON THE DEATH BENEFITS

Modern's other argument is that the ALJ erred by awarding interest on the death benefits awarded in this matter. Modern contends that death benefits which are awarded under KRS 342.750(6) are not income benefits subject to interest, but are medical benefits. However, *Realty Improvement Co.,*

8

*Inc. v. Raley*, 194 S.W.3d 818, 822 (Ky. 2006), states that for the purposes of KRS 342.750(6), a deceased worker's estate is a person and that the lump-sum benefit is a form of income benefit. Additionally, *Bradley v. Commonwealth*, 301 S.W.3d 27, 30 (Ky. 2009), held "that interest accrues on a lump-sum death benefit under KRS 342.040(1) just as it does on other past-due income benefits awarded under Chapter 342." *Id.* The ALJ did not err by awarding interest on the death benefits, and we must reject Modern's argument to the contrary.

Thus, for the above stated reasons, we affirm the decision of the Court of Appeals.

All sitting. All concur.

COUNSEL FOR APPELLANT,
MODERN PROPERTY MANAGEMENT:

Ronald Jude Pohl

COUNSEL FOR APPELLEES,
ESTATE OF JEFFREY ALLEN WILBURN
(DECEASED); JULIE A. VAN HOOK,
ADMINISTRATRIX AND PARENT AND
GUARDIAN OF AMANDA WILBURN
AND MAXWELL WILBURN; HEIDI MARIE
CANTER, PARENT AND NATURAL GUARDIAN
OF ICY CANTER:

Laurie Goetz Kemp